UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-62344-GAYLES

**DIRECT NICHE, LLC,**
    **Plaintiff,**

  v.

**VIA VAREJO S/A,**
    **Defendant.**
                /

## FINAL JUDGMENT

**THIS CAUSE** came before the Court for a nonjury trial which commenced on June 15, 2017, and concluded on June 21, 2017. After careful consideration of the arguments of counsel, the stipulations of the parties, and the evidence and testimony presented at trial, the Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a)(1), and enters final judgment in this action in favor of Defendant Via Varejo S/A, pursuant to Federal Rule of Civil Procedure 58.

## FINDINGS OF FACT

**A.** *Via Varejo and Casas Bahia*

  1. Defendant Via Varejo S/A ("Via Varejo") is a Brazilian corporation with its principal place of business in São Caetano do Sul, Brazil—a city in the state of São Paolo, Brazil. Joint Pretrial Stip. at 5-6. Via Varejo is the parent company of the "Casas Bahia" chain of retail stores. 4 Trial Tr. at 45:25-46:7.

  2. The first Casas Bahia store was founded as a furniture store in São Caetano do Sul in 1957 by Polish-Brazilian businessman Samuel Klein. *Id.* at 57:19-22, 58:5-11. Klein called his store "Casas Bahia" because of the large number of customers who hailed from the Brazilian state

1

of Bahia, which is approximately 1200 miles from São Paolo. *Id.* at 58:12-18. The first Casas Bahia store did not open in the state of Bahia until 2014. *Id.* at 59:12-14.

3. Over the next six decades, Casas Bahia has grown into a multibillion-dollar retail brand, with approximately 22,000 employees and more than 750 stores throughout Brazil; Casas Bahia made $5.6 billion in sales in 2016. *Id.* at 59:15-60:22.

4. Since 2009, Via Varejo has used the Casas Bahia brand in e-commerce under the domain *casasbahia.com.br*, which receives millions of visits from U.S. IP addresses every year. *Id.* at 29:25-30:5; *see also* 5 Trial Tr. 34:10-13.

5. According to the testimony of Via Varejo's marketing manager, Carin Duran, Via Varejo owns several other domains related to the *casasbahia.com.br* domain, because "quite often consumers will make mistakes when they're typing; and that way, by having these different domains, we can . . . redirect that traffic to the correct site, which is [*casasbahia.com.br*]." 4 Trial Tr. at 64:21-22. These domains include *casasbaia.com.br*, *casabahia.com.br*, and *cazasbahia.com.br*. *Id.* at 64:13-18.

6. Through the Casas Bahia brick-and-mortar stores and the Casas Bahia e-commerce website, Via Varejo sells electronics, furniture, appliances, and other consumer goods. 4 Trial Tr. at 30:6-10. Though the literal English translation of the Portuguese phrase "casas Bahia" is, in essence, "houses in the state of Bahia,"[1] Casas Bahia does not sell (nor has it ever sold) houses or real estate. *Id.* at 65:14-21.

7. Apart from the products that it sells to customers in Brazil through its stores and e-commerce, Via Varejo sells advertising services to third parties using its *casasbahia.com.br* website, including to U.S.-based third parties, in three ways.

8. First, since 2009, it has provided featured displays of third-party suppliers' products

---

[1] The phrase can also translate to "companies or firms from Bahia." 3 Trial Tr. at 91:25-92:2.

on the *casasbahia.com.br* website in exchange for payment or for discounts off the costs of products purchased from the supplier. *See, e.g.*, *id.* at 37:10-38:16, 113:13-16. Via Varejo submitted evidence and testimony regarding transactions between Casas Bahia and U.S. companies such as Intel, Microsoft, Black & Decker, Hewlett Packard, and Dell for these preferred advertising services on the *casasbahia.com.br* website dating as far back as 2009. *See* 5 Trial Tr. at 51:1-16, 56:5-57:8, 57:14-60:8, 61:19-63:23, 113:13-21.

9. Second, since early 2013, Via Varejo has provided third parties, including U.S.-based advertisers, the opportunity to purchase advertising exposure to Casas Bahia's consumer audience via a banner ad program between Via Varejo and Google. *See* 4 Trial Tr. at 35:23-37:9, 40:15-41:6; 5 Trial Tr. at 20:21-24. At least some of these Google-facilitated, U.S.-based advertiser ads are displayed to the growing number of visitors to the *casasbahia.com.br* website from the United States (4.2 million in 2016). *See* 5 Trial Tr. at 34:10-35:6.

10. And third, since 2016, Via Varejo, through Casas Bahia, has facilitated the sale of products imported to Brazil from U.S.-based sellers. *See id.* at 63:24-65:8.

11. Via Varejo owns a trademark portfolio for its CASAS BAHIA mark—approximately forty trademarks in countries around the world. 4 Trial Tr. at 63:6-64:9. At the time of trial,[2] Via Varejo owned pending applications for three CASAS BAHIA marks in the United States:

   (a) Application Serial No. 86/982,109 for a CASAS BAHIA "design plus words" service mark, filed July 30, 2013, which covers "advertising services for others";

   (b) Application Serial No. 86/023,975 for a CASAS BAHIA "design plus words" service mark, filed July 30, 2013, which covers "export and import agencies" for a variety of goods and "advertising services for others"; and

---

[2] According to Via Varejo's post-trial brief, as of June 27, 2017—six days after the conclusion of the trial—it now owns a CASAS BAHIA service mark in the United States—Trademark Registration No. 5,233,631. *See* Def.'s Post-Tr. Br. Ex. E. The Court gives no consideration to this change in application status in rendering this judgment.

3

(c) Application Serial No. 08/024,000 for a CASAS BAHIA "design plus words" service mark, filed on July 30, 2013, which covers "export and import agencies" for a variety of goods.

Joint Pretrial Stip. at 6-7.

**B.** *Direct Niche and Its Business*

12. Plaintiff Direct Niche, LLC ("Direct Niche"), is a Minnesota limited liability company with a principal place of business in St. Louis Park, Minnesota. Joint Pretrial Stip. at 6. Its sole business is in the acquisition of a portfolio of Internet domain names. 2 Trial Tr. at 11:14-20.

13. Direct Niche acquires these domain names through various online auctions and sales, as well as through first-hand registration on websites like GoDaddy.com. *Id.* at 13:24-14:11. At the time of trial, Direct Niche's portfolio contained over 150 domain names. *Id.* at 12:24-13:2.

14. Direct Niche's owner, Michael Knight, testified that Direct Niche's domain names are "generic names that people have lost interest in and have expired." *Id.* at 13:24:25.

15. On average, Knight pays between $500 and $1,500 for a domain name, and in "rare occasion[s]" he pays over $2,000. *Id.* at 65:4-6.

16. Direct Niche does not operate businesses under these domain names, but rather monetizes the domain names through resale or through a process called domain "parking," an arrangement by which a domain name owner permits a third party company the exclusive right to place (or "park") pay-per-click or other revenue-generating advertisements that are "relevant" to the "terms" contained in the domain name. *Id.* at 33:17-18. The third-party parking company pays Direct Niche a portion of the profits it generates from the advertisements. *Id.* at 53:13-54:2.

17. Direct Niche does not have control over the content of the advertisements, although it could in some circumstances provide the parking company with a set of keywords and have advertisements display relative to those keywords. *Id.* at 34:23-35:9.

18. When deciding whether to purchase a domain name, either through sale or auction, Knight researches the web traffic associated with that domain name. *Id.* at 139:11-140:8. The traffic to the particular domain, which Knight seeks to capitalize on, is generated by the prior domain owner through its use of the domain. In many cases, the prior owner is (or was) a real business. *Id.* at 140:9-19.

19. Approximately ninety percent of the time, Knight searches the domain name on Google to see if a real business exists that is associated with that name. *See id.* at 160:2-161:15; *see also id.* at 19:21 ("Typically I will type those words into Google and check and see what types of businesses might use those words in their domain names or in their businesses.").

20. Knight will also search Trademark Office records to determine whether a person or entity owns, seeks, or asserts trademark rights associated with the domain name. *Id.* at 13:19-23, 29:2-7.

21. Knight admits that, through Direct Niche, he seeks to acquire "domain investment properties," and that he particularly seeks out domains with favorable traffic numbers and high monthly earnings. *Id.* at 13:15, 14:21-15:2.

22. Knight testified that his ultimate intention when purchasing a high-value domain is to park the domain and generate revenue from the pay-per-click or zero-click advertisements placed there. *Id.* at 17:14-17, 159:3-17.

**C.** *Direct Niche's Registration of* **casasbahia.com**

23. On June 20, 2012, Direct Niche won an auction for the singular domain name *casabahia.com* (the "Casa Bahia Domain") at a price of $1,647. 2 Trial Tr. at 18:19-19:5. Knight then registered the domain. Joint Pretrial Stip. at 6.

24. Prior to bidding on the auction, Knight searched the Trademark Office database for **casasbahia.com**, **casa bahia**, and **"casa bahia"** and found no results. 2 Trial Tr. at 29:8-14.

25. He also testified he found nothing significant or substantial in a Google search of the singular **"casa bahia**," merely websites for hotels or resorts. *Id.* at 31:25-32:7. He does not believe he saw the Casas Bahia store in his search results "in any capacity." *Id.* at 32:11-13.

26. On June 15, 2015, Direct Niche registered the domain name at issue in this litigation, *casasbahia.com* (the "Casas Bahia Domain") after purchasing it in an online auction. Joint Pretrial Stip. at 7.

27. Knight's winning bid in the auction was $22,850. *Id.* at 58:15-16. That amount is the most Direct Niche had ever paid for a domain name—twenty times the average price Direct Niche pays for domain names. 3 Trial Tr. at 47:12-13; 50:13-25. That amount is also higher than Knight's own pre-purchase valuation of the domain—approximately $20,000—which he had calculated during the bidding process. *Id.* at 55:18-57:2.

28. Despite this marked increase in price, Knight did not perform any trademark or Google searches for the plural **casas bahia**, instead choosing to rely on his recollection of the searches he had performed for the singular **casa bahia** three years earlier. *Id.* at 68:23-69:3.

29. Like Direct Niche's other domains, the Casas Bahia Domain is used to generate revenue through the parking of advertisements. 2 Trial Tr. at 159:3-17.

30. The parked advertisements on the Casas Bahia Domain displayed to users can contain links to products directly competitive with products sold by Via Varejo on *casasbahia.com.br*: consumer electronics such as cellular telephones, furniture, and household appliances—some of the links even include the phrase "Casas Bahia." 3 Trial Tr. at 89:17-92:6.

31. The Casas Bahia Domain receives significantly more—if not the most—traffic of all of Direct Niche's domains (over 3.5 million hits between June 2015 and May 2017). 2 Trial Tr. at 57:3-13. By way of comparison, the Casa Bahia Domain received only 300,000 hits during that same time period, and the average domain from Direct Niche's portfolio would have received

6

around 230,000 hits (at an approximate rate of one thousand hits per month). *Id.* at 57:14-25.

32. The traffic to the Casas Bahia Domain is generated by individuals manually typing "casasbahia.com" into their web browser's address bar and being automatically redirected to the Casas Bahia Domain where the parked advertisements appear. *Id.* at 49:7-16, 101:3-102:1; 3 Trial Tr. at 75:3-10.

33. By the time of trial, the parked advertisements on the Casa Bahia Domain and the Casas Bahia Domain had generated approximately $1,342 and $15,867 in revenue, respectively, for Direct Niche. 2 Trial Tr. at 58:1-16.

34. Knight uses an address in St. Louis Park, Minnesota, as Direct Niche's business address. *Id.* at 5:25-7:7. He lists the business name and address as the registrant address for Direct Niche's domains, including the *Casa* Bahia Domain. *Id.* at 19:25-20:12.

36. He did not, however, list the address as the registrant address for the *Casas* Bahia Domain at the time he purchased it. Instead, he used a privacy service which applied a privacy address to mask Direct Niche's contact information. *Id.* at 134:17-135:6. He then manually altered the publicly available privacy address to reflect a false address—the address of another company he was considering retaining for privacy protection—thus creating a *double* layer of privacy protection. *Id.* at 132:4-135:19.

37. Knight testified that he used this privacy protection because he wanted to avoid receiving as many as ten junk emails per day, and to protect against his email address being hacked. 3 Trial Tr. at 4:23-5:21.

38. After Direct Niche initiated this lawsuit, Knight changed the registrant contact information to reflect Direct Niche's actual business address. *Id.* at 4:3-22.

39. Direct Niche registered two additional, related domains: *casa-bahia.org* and *casas-bahia.org*. It registered *casas-bahia.org* at some time between 2014 and 2016, and it registered

7

*casa-bahia.org* after it filed this action. 2 Trial Tr. at 62:6-8; Joint Pretrial Stip. at 8.

40. *Casabahia.com*, *casasbahia.com*, *casa-bahia.org*, and *casas-bahia.org* are the only domains in Direct Niche's portfolio in a language other than English.

41. *Casabahia.com*, *casasbahia.com*, *casa-bahia.org*, and *casas-bahia.org* are the only domains in Direct Niche's portfolio that are related to each other or can be grouped together in any way.

42. Even though Knight testified that having a singular and plural domain name "can be valuable," and he determines on a "case by case basis" whether one of the singular or plural is more valuable than the other or whether they both are valuable, 3 Trial Tr. at 20:7-12, *casabahia.com*, *casasbahia.com*, *casa-bahia.org*, and *casas-bahia.org* are the ***only*** domains in Direct Niche's portfolio that appear in both singular and plural iterations.

**D.** *Procedural History*

43. In July 2015, Via Varejo filed a complaint under the Uniform Dispute Resolution Policy ("UDRP"), challenging Direct Niche's registration of the Casas Bahia Domain. On October 17, 2015, a World Intellectual Property Organization panelist issued an Administrative Panel Decision on Via Varejo's complaint, ordering that the Casas Bahia Domain be transferred to Via Varejo. Direct Niche then filed the instant action on November 5, 2015.

**CONCLUSIONS OF LAW**

Direct Niche brings this declaratory judgment action under 15 U.S.C. § 1114(2)(D)(v), under which a domain name registrant whose domain name has been ordered to be transferred under the UDRP may file a civil action to establish that the registration or use of the domain name by the registrant is not unlawful. Direct Niche bears the burden to prove that its conduct is "not unlawful" under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), which provides, in relevant part:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
>
> (i) has a bad faith intent to profit from that mark . . . and
>
> (ii) registers, traffics in, or uses a domain name that—
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; **[or]**
>
> (II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to . . . that mark . . . .

15 U.S.C. § 1125(d)(1)(A).

It is not necessary that the "mark," as described in the statute, be a trademark registered with the U.S. Patent and Trademark Office, nor need it be a trademark for which a party has *applied* for federal registration. A federal trademark registration is not a prerequisite to obtaining or establishing trademark rights. *See Matal v. Tam*, 582 U.S. —, —, 137 S. Ct. 1744, 1752-53 (2017) ("Without federal registration, a valid trademark may still be used in commerce. . . . Unregistered trademarks may . . . be entitled to protection under . . . federal statutes such as the [ACPA]."); *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. —, —, 135 S. Ct. 1293, 1299 (2015) ("[F]ederal law does not create trademarks."). Under common law, substantive rights to a mark arise based on use in commerce and distinctiveness of the mark. *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).

To summarize, Direct Niche must prove that at least one of the following four elements *is not satisfied*: (1) it has registered, trafficked in, or used a domain name; (2) which is identical or confusingly similar to a mark owned by Via Varejo; (3) the mark was distinctive at the time of Direct Niche's registration of the domain name; and (4) Direct Niche committed the acts with a bad faith intent to profit from Direct Niche's mark. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (hereinafter "McCarthy") § 25A:50 (4th ed. 2003). There is

9

no dispute that element (1) is satisfied and that element (2) is at least partially satisfied: Direct Niche registered the domain name *casasbahia.com*, and should the Court conclude that CASAS BAHIA is a valid service mark owned by Via Varejo, *casasbahia.com* is identical or at least confusingly similar to Via Varejo's CASAS BAHIA mark (or Via Varejo's *casasbahia.com.br* website). *See Jysk Bed'n Linen v. Dutta-Roy*, 810 F.3d 767, 778 (11th Cir. 2015).

### *The CASAS BAHIA Mark Is a Valid Service Mark*

Via Varejo asserts that it has a common law service mark under the CASAS BAHIA name in providing advertising services for others. "Service marks and trademarks are governed by identical standards, . . . and thus like with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916)). There is no question that Via Varejo adopted the CASAS BAHIA mark, so the Court simply need determine whether Via Varejo used the mark in commerce. *See Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) ("Common-law trademark rights are 'appropriated only though actual prior use in commerce.'" (citation and internal quotation marks omitted)).

The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. And it defines "use in commerce" vis-à-vis a service mark as

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

*Id.* "The term 'use in commerce' as used in the Lanham Act 'denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit mak-

ing activity.'" *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) (quoting *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92-93 (2d Cir. 1997)). "Because Congress's authority under the Commerce Clause extends to activity that 'substantially affects' interstate commerce, the Lanham Act's definition of 'commerce' is concomitantly broad in scope: 'all commerce which may lawfully be regulated by Congress.'" *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 559 (1995); 15 U.S.C. § 1127). "Since the nineteenth century, it has been well established that the Commerce Clause reaches to foreign trade. And, for the same length of time, the Supreme Court has defined foreign trade as trade between subjects of the United States and subjects of a foreign nation." *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 365 (4th Cir. 2003); *see also United States v. Steffens* (*In re Trade-mark Cases*), 100 U.S. (10 Otto) 82, 96 (1879) ("[C]ommerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations . . . .").

As found above, Via Varejo's advertising services for others, through Casas Bahia, are rendered in the United States and in at least one foreign country (Brazil). It has provided advertising services for U.S. companies by displaying preferred advertisements for those U.S. companies' products directly on the Casas Bahia website, in exchange for payment or discounts on products. It has provided advertising services for U.S. companies on the Casas Bahia website through its banner ad program. And it has facilitated the sale of products imported to Brazil from U.S. sellers through Casas Bahia. Under the broad scope of the use-in-commerce definition, the Court concludes that the evidence presented at trial shows that Via Varejo used the CASAS BAHIA service mark in commerce in the United States. *See Sprecht v. Google Inc.*, 747 F.3d 929, 934 (7th Cir. 2014) ("[A] website that bears a trademark may constitute a *bona fide* use in commerce." (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008))); *In re Caruso Prop.*

*Mgmt., Inc.*, Serial No. 78241396, 2005 WL 3175151, at *1, *3 (T.T.A.B. Nov. 2, 2005) (concluding that a mark owner that sells space for third-party advertisements in a medium that bears the mark owner's mark uses the mark in commerce in connection with advertising services for others, and finding that the medium need not explicitly reference the fact that the owner of the mark does, in fact, provide those advertising services). Thus, Via Varejo established use of its CASAS BAHIA mark in commerce.

### *The CASAS BAHIA Mark Is Distinctive*

"The law in this circuit is clear that the four categories of distinctiveness in trademark law, listed in descending order of strength, are: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic." *Knights Armament Co.*, 654 F.3d at 1188. "The demarcation between each category is more blurred than it is definite." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991). "An 'arbitrary or fanciful' mark bears no logical relationship to the product it represents." *Knights Armament Co.*, 654 F.3d at 1188. "A 'suggestive' mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product." *Id.* (internal punctuation marks omitted) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357-58 (11th Cir. 2007)). "A 'descriptive' mark identifies a characteristic or quality of the product," and a "'generic' mark describes the class to which a good belongs." *Id.*

Arbitrary, fanciful, and suggestive marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A descriptive mark may become distinctive, and thereby receive protection, if it acquires "secondary meaning," *i.e.*, "when the primary significance of the term in the minds of the [consuming] public is not the product but the producer." *Welding Servs., Inc.*, 509 F.3d at 1358. A determination of whether a mark has acquired secondary meaning requires consideration of several factors: "the length and nature of the name's

use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." *Id.* A generic mark "is afforded no trademark protection because it is not distinctive and cannot acquire secondary meaning." *Knights Armament Co.*, 654 F.3d at 1188.

Based on the evidence presented at trial, the Court concludes that Via Varejo's CASAS BAHIA mark is arbitrary or fanciful. The literal English translation of "casas Bahia" is "houses in the state of Bahia," but there is no logical relationship between the words of the mark itself and the services Via Varejo provides via the mark. Pertinent to this case, Via Varejo provides advertising services for others in the sale of, among other things, consumer electronics, furniture, and household appliances. Its services have nothing to do with houses or real estate. CASAS BAHIA could not be considered any of the other three categories of distinctiveness. "Casas Bahia" does not refer to a characteristic of the advertising services Via Varejo provides. It does not identify a characteristic or quality of the advertising services. And it does not describe a class to which the advertising services belongs. Because the CASAS BAHIA mark is arbitrary or fanciful, it is thus inherently distinctive and has been since before June 2015 when Direct Niche registered the Casas Bahia Domain.

### *Direct Niche Acted with a Bad Faith Intent*

To review, based on the Court's findings and conclusions above, Direct Niche has failed to establish three of the four elements under the ACPA. It has registered, trafficked in, and used the Casas Bahia Domain. The Casas Bahia Domain also is identical or at least confusingly similar to Via Varejo's CASAS BAHIA service mark, which was distinctive at the time Direct Niche registered the Casas Bahia Domain. What remains, then, is a determination of whether Direct Niche has proven that it did not commit these acts with a bad faith intent to profit from Via Varejo's

CASAS BAHIA mark.

"To guide courts in determining the critical issue of what constitutes 'bad faith' under the ACPA, Congress set out . . . a list of nine non-exhaustive factors relevant to determining whether [a registrant] acted in bad faith":

(1) the trademark or other intellectual property rights of the person, if any, in the domain name;

(2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of Section 1125(d)(1)(B)(i).

5 McCarthy § 25A:53; 15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IX). "These factors, as a whole, focus on whether the defendant's use of the disputed domain name is legitimate—*i.e.*, for some purpose other than simply to profit from the value of the trademark." *Ford Motor Co. v. Greatdomains.com,*

*Inc.*, 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001). Use of these factors is permissive: a court "need not . . . march through the nine factors seriatim," because "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case.'" *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 & 269 (4th Cir. 2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)); *see also Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004) ("The role of the reviewing court is not simply to add factors and place them in particular categories, without making some sense of what motivates the conduct at issue. The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit.").

Having considered the above factors and the unique circumstances of this case, the Court concludes that Direct Niche has failed to prove that it did not act in bad faith. Knight admits that his ultimate intention is to seek out and purchase high-value domains so that he can park them and generate revenue from pay-per-click or zero-click advertisements placed there. These admissions make clear that Direct Niche registered the Casas Bahia Domain in bad faith. *See Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 98 (2d Cir. 2011) (per curiam). Whether or not Direct Niche had any intention of selling the Casas Bahia Domain to Via Varejo, it clearly had the intention to profit from the goodwill associated with the CASAS BAHIA mark, which comprised the domain name. *See id.*

Direct Niche's "business model relied upon diverting internet users (presumably, among others, those who were attempting to access the website[] of [Casas Bahia] to [its] own website— which . . . at the very least was not what the searchers sought to find—in order to profit from the 'pay-per-click revenue' that their increased web traffic would bring his site." *Id.* It is clear to the Court that Direct Niche intended to profit from prospective Via Varejo customers who are unaware that Via Varejo's Casas Bahia website is found, not at *casasbahia.com*, but at *casasbahia.com.br*.

*See Sporty's*, 202 F.3d at 493 ("The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com."). Indeed, this is precisely the situation Via Varejo itself has striven to prevent. As its marketing manager testified, Via Varejo registered domains related to the CASAS BAHIA mark, including *casasbaia.com.br*, *casabahia.com.br*, and *cazasbahia.com.br*, in order to redirect consumers to the correct website. With that in mind, why else would **Direct Niche** have taken a similar path in purchasing and registering *casabahia.com*, *casasbahia.com*, *casa-bahia.org*, and *casas-bahia.org* if not "in anticipation that consumers would make a mistake, thereby increasing the number of hits [its] site would receive, and, consequently, the number of advertising dollars [it] would gain"? *Shields v. Zuccarini*, 254 F.3d 476, 484 (3d Cir. 2001); *see also Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. 10-3738, 2015 WL 5311085, at *25 (C.D. Cal. Sept. 10, 2015) ("[The] heartland" of the ACPA is "ransoming a domain name or diverting Web traffic from the mark-holder's legitimate website."), *appeal dismissed*, No. 15-56687 (9th Cir. Feb. 9, 2016).

Direct Niche (through Knight) has provided no credible testimony to explain why, of its portfolio of over 150 domains, only the *casabahia.com*, *casasbahia.com*, *casas-bahia.org*, and *casas-bahia.org* domains are in a foreign language; why only those four domains are interrelated or can be grouped together in any way; or why no other domain name appears in both singular and plural iterations or in .com and .org iterations. Direct Niche fails to plausibly explain why it publicly listed its name and St. Louis Park, Minnesota, address as the registrant name and address for its other domains, yet hid its identity behind *two* layers of privacy protection when the time came to register the Casas Bahia Domain—that is, until this lawsuit was filed, at which time it changed the registrant to its own name and address. *See Bulbs 4 E. Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1170 (S.D. Tex. 2016) (finding that an ACPA defendant's "pattern of using misleading contact information when applying for registration of domain names . . . even if he allegedly does so for

the purpose of protecting his privacy" weighed in favor of a finding of bad faith (citation omitted));
*Morrison & Foerster, LLP v. Wick*, 94 F. Supp. 2d 1125, 1132 (D. Colo. 2000) (finding that evidence that an ACPA defendant changed his registrant contact information after the litigation was filed was indicative of bad faith). Knight claims that he utilized the double layer of privacy protection so that he could avoid receiving up to ten unsolicited junk emails per day or to guard against hacking. The Court does not find these purported justifications to be credible, because the Casas Bahia Domain is the *sole* domain out of Knight's 150-domain portfolio for which he sought out these protections, and because Knight removed the protections once the lawsuit had been filed.

Finally, and perhaps most importantly, Knight has offered no credible testimony to explain why Direct Niche purchased the Casas Bahia Domain for an amount ($22,850) *twenty times* more than the purchase price for the average domain in its portfolio (approximately $1,000)—and nearly *fourteen times* more than the purchase price for the *Casa* Bahia Domain ($1,647)—without performing a single web search or trademark search to inquire into why the Casas Bahia Domain was fetching such an extraordinarily high price.

Under the ACPA's enumerated factors, as well as "the unique circumstances of this case," *Sporty's*, 202 F.3d at 499, the Court concludes that Direct Niche has failed to prove that it did not act with a bad faith intent to profit from Via Varejo's CASAS BAHIA mark in registering, using, and trafficking in the Casas Bahia Domain.

### *Direct Niche Is Not Entitled to the Safe Harbor Defense*

"There is also a safe-harbor provision in the ACPA . . . ." *Jysk Bed'n Linen*, 810 F.3d at 776. Under that provision, "regardless of which direction the bad faith factors point . . . '[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.'" *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221 (11th Cir. 2012)

(quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). In other words, "to qualify for that safe harbor, [Direct Niche] must have had both a subjective belief and an objectively reasonable belief in the lawfulness of its actions." *Id.* at 1226.

"[C]ourts should 'make use of this . . . defense very sparingly and only in the most unusual cases,'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 (9th Cir. 2009) (quoting *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006)). "Otherwise, the defense would 'undermine the rest of the statute' because '[a]ll but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior.'" *Id.* (quoting *Virtual Works*, 238 F.3d at 270). Even so, the Court must consider the safe harbor defense regardless of the outcome of the bad faith analysis; there is no "statutory factors tipping point at which the . . . defense tumbles out of the case." *Pensacola Motor Sales*, 684 F.3d at 1223.

Although Knight may subjectively believe that Direct Niche's use of the Casas Bahia Domain was lawful, the Court concludes that his belief is not objectively reasonable. Direct Niche's only evidence in support of its argument as to objective reasonableness is Knight's self-serving attestation that he searched Google and the USPTO database for **"casa bahia"** and **"casas bahia"** in 2012—three years prior to registering the Casas Bahia Domain—and found nothing substantial. If those search results returned both singular and plural results, as Knight claims it did, the Court is hard-pressed to accept that he would have found a random assortment of websites for real estate listings, resorts, and hotels but *would not* have found Via Varejo's Casas Bahia website, especially considering Casas Bahia's substantial presence as the largest retailer in Brazil. That notwithstanding, Knight's failure to perform the searches in 2015—at which time it most certainly would have found Via Varejo's then-pending CASAS BAHIA trademark applications, if not an increased e-commerce

presence by Casas Bahia, as well—is objectively unreasonable.[3]

In sum, the Court does not find Knight's testimony credible. Therefore, the Court concludes that Direct Niche cannot avail itself of the "safe harbor" defense and that it has, therefore, failed to prove that its conduct is "not unlawful" under the ACPA.

\* \* \*

Accordingly, pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court enters final judgment **IN FAVOR OF** Defendant Via Varejo S/A and **AGAINST** Plaintiff Direct Niche, LLC. Pursuant to 15 U.S.C. § 1114(2)(D)(v), the Court **DECLARES** that Plaintiff Direct Niche, LLC's registration and use of the domain *casasbahia.com* **DOES NOT COMPLY** with the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). Plaintiff Direct Niche, LLC, shall take nothing from this action.

This action is **CLOSED**. The Court retains jurisdiction to enter post-judgment relief.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of August, 2017.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

---

[3] Knight's testimony on this point is conflicting. During his deposition, he was asked whether before buying *casasbahia.com* in 2015, he would have looked to see whether there was a retail store. He responded, "Right, I might have checked that." 3 Trial Tr. at 70:8-16. Via Varejo's counsel then said, "The plural," to which Knight responded, "Yes." *Id.* at 70:17. At trial, Knight testified that he believed he did not need to do extra research in 2015 as to the plural *casasbahia.com*.